UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JERRICK PUGH | CIVIL ACTION |
| VERSUS | NO. 05-1205 |
| BURL CAIN, WARDEN | SECTION C |
| LOUISIANA STATE PENITENTIARY | |

### ORDER AND REASONS

Before this Court is a petition for habeas corpus relief by Mr. Jerrick Pugh pursuant to 28 U.S.C. § 2254.  As grounds for relief, petitioner claims that his due process and fair trial rights were violated when: 1) African Americans were systematically removed from the jury that convicted him; 2) his conviction was obtained by use of a coerced and involuntary confession; and 3) he was incompetent to stand trial and assist in his defense.

Upon a thorough review of the trial, direct appeal, and post-conviction records, the habeas petition and memoranda, and applicable law, the Court has determined that petitioner's habeas corpus petition is without merit. For the reasons set forth below, this petition is **DENIED**.

**I.     Background and Procedural History**

Petitioner is a state prisoner at Louisiana State Penitentiary in Angola.[1]  Petitioner filed this federal application for habeas corpus on February 28, 2005.[2]  The following relevant facts are edited from the opinion issued by the Louisiana Fifth Circuit Court of Appeal:

---

[1] Fed. Rec. Doc. 1, Petition for Writ of Habeas Corpus, *Pugh v. Cain*, No. 05-1205.
[2] *Id*.

On November 13, 1997, a Jefferson Parish Grand Jury returned a bill of indictment charging the Defendant with first degree murder. The Defendant pled not guilty at arraignment. After the Defendant filed a motion to appoint a sanity commission, a hearing was held and the trial judge found the Defendant to be incompetent to stand trial. After a second sanity hearing, the trial judge found that the Defendant had improved and was competent. The Defendant filed two additional motions to appoint a sanity commissions, hearings were held, and he was found to be competent. The trial judge also denied the Defendant's motion to suppress his statement. Thereafter, the State amended the bill of indictment to charge the Defendant with second degree murder.

A jury trial commenced on March 21, 2001 and the following evidence came forth. In the early morning hours of September 13, 1997, Deputy Dana Parker of the Jefferson Parish Sheriff's Office (JPSO) responded to a call of a shooting in the 300 block of Ruby Street... Deputy Parker found the victim, Ronald Bourgeois, lying in the parking lot of an apartment complex at 321 Ruby Street. According to Deputy Parker, the victim had an apparent gunshot wound to the head, was alive, but was unresponsive. George Simmons, Sr. (Simmons, Sr.), who was near the victim when Deputy Parker arrived, gave Deputy Parker a description of a van that had left the scene after the shooting…

[A]pproximately two blocks from the crime scene, Sergeant Bussard saw a parked gray van. When he stopped to investigate, Sergeant Bussard observed that no one was in the van and the windows were half open on both sides. Sergeant Bussard observed a .22 caliber cartridge and a key sitting on an upside down bucket between the seats. Sergeant Bussard called a deputy to stay with the van and he went to the crime scene… Simmons, Jr. positively identified the van as the one he saw leaving the crime scene. After canvassing the area that night, Sergeant Bussard discovered the van was used by Brence and Eugene Burden, who denied ownership of the bullet in the vehicle.

The first suspect in the shooting was Kemo Charles… The Burdens identified Charles as the person who had rented the van from them that night, and both Simmons stated that Charles was the person who had shot the victim... Simmons, Jr. subsequently told Detective Tucker that the Defendant was the person who had shot the victim. Detective Tucker stated that Simmons, Jr. told him that he had initially misled the police because he was afraid of the Defendant.

The Defendant was arrested and, on September 18, 1997, he gave two tape-recorded statements to Detective Ralph Sacks… In the first statement, the Defendant said that he had been at his girlfriend's apartment at approximately 2:00 or 3:00 a.m. before going to Ruby Street. A friend, Robert, also known as "Chop", arrived at the Defendant's girlfriend's apartment where the Defendant was using cocaine. Robert joined the Defendant in "getting loaded." Robert and the Defendant met Danny, one of Robert's friends, at the complex, then later Charles. The Defendant claimed that the shooting happened when, "all of a sudden a white man come from around the corner, he just shot all over there." The Defendant said that the white man was walking through the apartments near Ruby Street before the shooting. When Detective Sacks asked who had shot toward the victim, the Defendant replied, "Robert, Kemo, and ··· Danny." The Defendant said

2

that he was standing near the Simmons' apartment immediately before the shooting, and ran inside the apartment after the shooting. After, he and Simmons, Jr. "started snorting"cocaine together… The Defendant said that he told his girlfriend that he was not involved in the shooting. The Defendant denied seeing a gun and borrowing a gray van from anyone that night…

[T]he Defendant made another statement in which he admitted that the victim was shot while the Defendant was attempting to rob him. The Defendant acknowledged that the beginning of the previous statement was true, but admitted that he, Danny and Robert had obtained the van, which was rented in part for "some powder" provided by the Defendant… A few minutes later, they parked the van and the victim walked toward the van and said, "I want something for forty," which the Defendant explained meant that the victim wanted to buy crack cocaine. The Defendant decided that he would "have to rob" the victim, since the Defendant had already spent all of his money on cocaine. The Defendant picked up the gun that was in the van and, as Danny was "about to serve" the cocaine, Defendant said "just give it up ⋯ I want the money." According to the Defendant, the victim grabbed the gun and it "went off." After the shooting, Danny and Robert left in the van, while the Defendant ran to the Simmons' residence where he left the gun and his clothing. The Defendant said that his girlfriend and Charles came over to the Simmons' apartment and that he left with the two of them shortly thereafter. According to the Defendant, Charles did not have anything to do with the shooting and was not even outside when the shooting happened…

Simmons, Jr. testified similar to the second statement… According to Simmons, Jr., the Defendant was armed with a gun and was planning to go to Baton Rouge in the van to "do some robbing." When Simmons, Jr. saw the victim nearing the van, he returned to his apartment across the street. He turned around and saw that "Jerry had the gun on the man, then, the man threw his hands up like, 'No'..." Simmons, Jr. testified that it appeared as though the victim grabbed the gun… The Defendant and Simmons, Jr. used some more cocaine and then provided the Defendant a change of clothes… Simmons, Jr. stated that he had initially misled the police because he was afraid of the Defendant…

According to Dr. McKenzie, who performed the victim's autopsy, the bullet was probably fired less than twelve inches from the victim's head. Dr. McKenzie stated that the distance could be even less, between six to eight inches, if a .22 caliber gun had been used.

On March 28, 2001, ten members of the twelve person jury found the Defendant guilty of second degree murder. On May 3, 2001, the trial judge… sentenced the Defendant to life imprisonment without benefit of probation, parole or suspension of sentence.[3]

---

[3] *State v. Pugh*, 831 So.2d 341, 343-46 (La.App. 5 Cir. 2002).

3

On October 16, 2002, the Louisiana Fifth Circuit Court of Appeal affirmed his conviction and sentence.[4] Petitioner did not apply for writs to the Louisiana Supreme Court.[5] He filed an application for post-conviction relief on July 9, 2003, alleging three claims.[6] On September 25, 2003, the trial court denied his incompetency and involuntary confession claims on the merits, and ordered petitioner to provide reasons why he had not raised his *Batson*[7] claim on appeal.[8] Petitioner's supplemental post-conviction application, with reasons for excluding his *Batson* claim on appeal was denied on October 23, 2003 for failure to use the proper application.[9] The Louisiana Fifth Circuit Court of Appeal denied writs on December 9, 2003, finding no error in the trial court's two denials of relief.[10] On February 4, 2005, the Louisiana Supreme Court denied writs.[11] Petitioner filed his federal habeas corpus petition on February 28, 2005.[12] On April 26, 2006, the district court adopted the magistrate judge's report and recommendations, and dismissed the petition with prejudice as untimely.[13] When petitioner noticed his intent to appeal with the United States Court of Appeals for the Fifth Circuit, the case was remanded to the Eastern District Court for a review of whether the notice was timely filed.[14] The case was transferred to this Court, which determined that the notice was timely.[15] Additional case law affecting the validity of the underlying order and reasons was uncovered,[16] and the Court requested a remand,[17] which was granted.[18]

---

[4] *Id*. The Court notes that the case was remanded solely for the purpose of advising petitioner of the prescriptive period for seeking post-conviction relief, which it did on October 28, 2002 (see State Rec. Vol. 4).
[5] State Rec. Vol. 20, Verification of the Clerk of the Louisiana Supreme Court.
[6] State Rec. Vol. 1, Uniform application for post-conviction relief.
[7] *Batson v. Kentucky*, 476 U.S.79 (1986).
[8] State Rec. Vol. 1, Order, No. 97-7172, *State v. Pugh*, September 25, 2003.
[9] State Rec. Vol. 1, Order, No. 97-7172, *State v. Pugh*, October 23, 2003.
[10] *State v. Pugh*, 831 So.2d 341, 343-46 (La.App. 5 Cir. 2002).
[11] *State ex rel. Pugh v. State*, 893 So.2d 870 (La. 2005), No. 2004-KH-0231.
[12] Fed. Rec. Doc. 1, Petition for Writ of Habeas Corpus, *Pugh v. Cain*, 05-1205.
[13] Fed. Rec. Doc. 8, Order Adopting Report and Recommendations, April 26, 2006.
[14] Fed. Rec. Doc. 14, Order and Remand, August 11, 2006.
[15] A pleading is considered filed when tendered to the prison custodian. *Causey v. Cain*, 450 F.3d 601 (5th Cir. 2006), citing *Houston v. Lack*, 488 U.S. 266, 270-71. (*Houston* interpreted federal procedural rules and held that a *pro se* petitioner's notice of appeal is deemed filed at the moment it is delivered to prison authorities.)
[16] *Id*.
[17] Fed. Rec. Doc. 15, Order and Motion for remand, October 17, 2006.
[18] Fed. Rec. Doc. 17, Order granting remand for further review, December 12, 2006.

**II.     Jurisdiction**

Jurisdiction is proper under the Antiterrorism and Effective Death Penalty Act (AEDPA) if the petitioner is "in custody" under the conviction he is attacking.[19]  Petitioner Pugh is confined at the Louisiana State Penitentiary in Angola, therefore jurisdiction is proper.

**III.    Venue**

Venue is proper under AEDPA in the district where the inmate is in custody or where the state court conviction and sentence were obtained.[20]  Petitioner Pugh was convicted and sentenced in Jefferson Parish, therefore venue in the Eastern District of Louisiana is proper.

**IV.     Timeliness**

The state submits that the petition is untimely, and after reviewing the record this Court does not agree. Generally speaking, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires that a petitioner bring his Section 2254 claims within one year of the date on which his conviction became final.[21]  Pursuant to 28 U.S.C. § 2244(d)(1)(A), petitioner's one-year limitation period for seeking federal habeas corpus relief commenced running on the date the judgment "became final by the conclusion of direct review or the expiration of the time for seeking such review."  Direct review includes a petition for certiorari to the United States Supreme Court.[22]  If no petition is filed, then the conviction becomes final when the time for seeking direct review expires.[23]  If a defendant has pursued his direct appeal through the highest

---

[19] 28 U.S.C. § 2241(c)(3); 28 U.S.C. § 2254(a).
[20] 28 U.S.C. § 2241(d).
[21] 28 U.S.C. § 2244(d).
[22] *Foreman v. Dretke*, 383 F.3d 336, 338 (5th Cir.2004), citing *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir.2003).
[23] *Id*. at 338.

state court, the time for seeking direct review includes the 90 days for filing a petition for certiorari to the Supreme Court.[24] If not, then it includes only the time for seeking further state-court direct review.[25]

Petitioner did not seek writs from the Louisiana Supreme Court on his direct appeal, so his conviction became final thirty days after the opinion issued by the Louisiana Fifth Circuit Court of Appeal, or on November 15, 2002. On this date, the one-year statute of limitations for filing a federal habeas corpus petition began to run.[26] AEDPA's statute of limitations is tolled for the period during which a properly filed application for post conviction relief or other collateral review attacking a conviction or sentence is pending in state court.[27] Out of an abundance of caution, this Court construes any tolling ambiguities in favor of a petitioner. Petitioner filed a post-conviction application on July 9, 2003, or 236 days later. The district court denied his original and supplemental claims, and the Louisiana Fifth Circuit Court of Appeal denied writs on December 9, 2003. Petitioner had thirty days to apply for writs with the Louisiana Supreme Court. A pleading is considered filed when tendered to the prison custodian.[28] When considering the timeliness of a pleading filed by a prisoner acting *pro se*, courts employ the "mailbox rule," i.e., a pleading is considered to be filed for prescriptive purposes on the date it is delivered to prison officials for mailing, rather than the date it is received by the court.[29] It may reasonably be inferred that a prisoner delivered his pleading to

---

[24] *Id.*
[25] *Id.*
[26] See *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003); *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).
[27] See *Fields v. Johnson*, 159 F.3d 914 (5th Cir. 1998); 28 U.S.C. § 2244(d)(2).
[28] *Causey v. Cain*, 450 F.3d 601 (5th Cir. 2006), citing *Houston v. Lack*, 488 U.S. 266, 270-71, 108 S.Ct. 2379, 101 L.Ed.2d 245. (*Houston* interpreted federal procedural rules and held that a *pro se* petitioner's notice of appeal is deemed filed at the moment it is delivered to prison authorities for forwarding to the district court.)
[29] *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).

prison officials for mailing on the date he signed it.[30]  Petitioner signed his writ application on December 26, 2003. Therefore, the statute was tolled from July 9, 2003 until February 4, 2005, when the Louisiana Supreme Court denied writs.  Petitioner filed his federal habeas petition on February 28, 2005, 24 days later. A total of 260 days of the 365-day period elapsed prior to petitioner's habeas petition.

For the reasons stated above, the Court finds that Mr. Pugh's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 is timely.

V.     **Exhaustion**

Petitioner has exhausted available state remedies as required by AEDPA.  Under AEDPA, a petitioner must first exhaust his remedies in state court before seeking habeas relief from the federal courts.[31]  "To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts."[32]  Generally, the exhaustion requirement is satisfied only when the grounds urged in a federal habeas petition were previously presented to the state's highest court in a procedurally proper manner according to state court rules.[33]

Petitioner presents three claims for review in his petition as listed above.  All were raised in his application for writs of certiorari to the Louisiana Supreme Court in his application for post conviction relief. Accordingly, petitioner has satisfied AEDPA's exhaustion requirement. Therefore, the Court will address petitioner's claims on the merits.

---

[30] See *United States v. O'Kaine*, 971 F.Supp. 1479, 1480 (S.D. Ga. 1997), where the court inferred that the signature date on the petitioner's 28 U.S.C. § 2255 motion to vacate was the date he deposited the motion with prison officials for forwarding to the court.
[31] 28 U.S.C. § 2254(b)(1)(A).
[32] *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (internal quotation marks omitted).
[33] *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988).

7

## VI.    Standard of Review

AEDPA comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of fact and law.[34] Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).[35] As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[36] The United States Supreme Court has noted the following:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams v. Taylor*, 529 U.S. 362 (2002) that an unreasonable application is different from an incorrect one.[37]

As to questions of fact, factual findings are presumed to be correct, and a federal court will give great deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[38]

---

[34] 28 U.S.C. § 2254(d):
An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

[35] *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

[36] 28 U.S.C. § 2254(d)(1).

[37] *Bell v. Cone*, 535 U.S. 685, 694 (2002), internal citations omitted.

[38] 28 U.S.C. § 2254(d)(2); see also *Hill v. Johnson*, 210 F.3d 481, 485; 28 U.S.C. § 2254(e)(1).

**VII.   Law & Analysis**

**(1) Petitioner argues that African Americans were systematically removed from the jury that convicted him.**

This argument was raised in petitioner's application for post-conviction relief.

"When the state court has relied on an independent and adequate state procedural rule, federal *habeas* review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice."[39]  To establish cause, "there must be something *external* to the petitioner, something that cannot fairly be attributed to him."[40]  To establish a fundamental miscarriage of justice, the petitioner must make "a persuasive showing that he is actually innocent of the charges against him.  Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted."[41]

The state district court ordered the petitioner to provide reasons why he had not raised this issue during his direct appeal. After petitioner submitted his supplemental application, the court denied relief because petitioner failed to submit the proper application. The Court finds that petitioner has demonstrated neither cause and prejudice nor a fundamental miscarriage of justice. In order to show cause, petitioner must show that some objective factor, external to the defense, prevented him or his defense counsel from raising the claim at issue in a procedurally proper manner.[42]  Petitioner failed to submit the supplemental application in proper form, and the court denied his claim because "'Inexcusable failure of the petitioner to comply with the provisions of the Article may be a basis for dismissal of his application.' Defendant has failed to use the proper

---

[39] *Hughes v. Johnson,* 191 F.3d 607, 614 (5th Cir. 1999).
[40] *Johnson v. Puckett*, 176 F.3d 809, 816 (5th Cir. 1999), quotation marks omitted, emphasis in original.
[41] Finley, 243 F.3d at 220 (citations omitted).
[42] *Romero v. Collins*, 961 F.2d 1181, 1183 (5th Cir. 1992).

9

application in compliance with Louisiana Code of Criminal Procedure Article 926(D). Defendant should re-file his application in compliance with Louisiana Code of Criminal Procedure Article 926(D)." Petitioner instead sought writs from the appellate court. Therefore, petitioner cannot establish cause, as he chose not to re-file in proper form. "Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice."[43]

Since cause has not been shown, petitioner can overcome the procedural bar only by showing a fundamental miscarriage of justice. The United States Fifth Circuit Court of Appeals has held:

> [A] fundamental miscarriage of justice may be demonstrated by a showing that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To satisfy this standard, a petitioner must show that he is actually innocent. To demonstrate actual innocence, it is necessary that the petitioner show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. . . in light of all of the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongfully excluded or to have become available only after trial.[44]

Petitioner does not allege, much less demonstrate, that he is *actually innocent* of the crime of second degree murder. Instead he argues that he was not competent to stand trial because he was mildly mentally retarded, and that his confession was involuntary and coerced. The record does not support this claim. While the petitioner was deemed incompetent to stand trial initially, later, in a series of competency hearings, he was adjudged competent to stand trial. There is no support beyond petitioner's allegations that his statement, wherein he confessed that he shot the victim when he grabbed for the gun and it went off, was involuntary. Therefore, petitioner has not shown that any fundamental miscarriage of justice has resulted from application of the procedural bar to his claim of racial discrimination in the jury selection.

---

[43] *Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir. 1996).
[44] *Lucas v. Johnson*, 132 F.3d 1069, 1077 (5th Cir. 1998), quotation marks and citations omitted.

10

In the interests of judicial economy, this Court, having reviewed the entire record, finds not only that his racial discrimination in his jury selection claim is procedurally barred, but also that his claim is without merit.

Petitioner argues that: 1) Kirk Claverie, 2) Darlene Collins, and 3) Adell Brown were all improperly struck during voir dire by the prosecutor in a systematic exclusion of blacks from the jury in violation of Batson.[45] The record does not support this claim. First, although the petitioner argues that he was tried by an all-white jury, the record does not note the race of any of the jurors, with the exception of those at whose exclusion the defense raised Batson challenges.

> Under Batson, a defendant objecting to a peremptory challenge must first establish a prima facie case of discrimination by showing facts and relevant circumstances which raise an inference that the prosecutor used the challenges to exclude potential jurors on account of race. The burden of production then shifts to the prosecutor to come forward with a race-neutral explanation for the challenges. The explanation need not be persuasive, or even plausible, and unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered may be deemed race-neutral. The trial court then must decide whether the defendant has proved purposeful racial discrimination. The ultimate burden of persuasion remains on the defendant to prove purposeful discrimination.[46]

At each Batson challenge, the prosecutor was asked by the judge to give a race-neutral explanation for the peremptory strike, which he did. The prosecution explained: 1) "Mr. Claverie indicated a hesitation in sentencing. Also tried to identify Mr. Dohre."[47]; and 2) "Darlene Collins said she was a Heat (sic) Start Teacher in Orleans. I thought that maybe she was going to be sympathetic for the Defendant; especially when we move to present to the jury that he's mildly retarded."[48] The judge agreed with the prosecution that the defense had not made a prima facie

---

[45] *Batson v. Kentucky*, 476 U.S.79 (1986).
[46] *State v. Crawford*, 873 So.2d 768, 782 (La.App. 5 Cir. 2004), citations omitted.
[47] State Rec. Vol. 19, p. 249, (Trial Transcript, page number 196).
[48] *Id*.

11

case of discrimination and accepted the state's two peremptory challenges.[49] The prosecution explained that: 3) "Mrs. Brown also said that she works as a Licensed Practitioner Nurse at the Metropolitan Developmental Center… And that mental difficulties can excuse culpabilities."[50] The judge allowed the peremptory challenge.[51]

Each of the Batson challenges was raised, examined and denied through the proper exercise of the trial judge's discretion, when he found no purposeful racial discrimination. The Court defers to the state court decision, finding nothing based on any unreasonable determination of the facts in light of the evidence presented at trial, and finding nothing contrary to or involving an unreasonable application of clearly established Federal law.

**(2) Petitioner argues that his conviction was obtained through the use of a coerced and involuntary confession.**

Petitioner raised this argument on appeal and in his application for post-conviction relief.

With respect to state court evidentiary rulings, a federal habeas court does not sit to review the correctness of such rulings.[52] It is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions."[53] A federal habeas court does not sit as a "super" state supreme court to review errors under state law.[54] An error made by the trial judge justifies "habeas corpus relief only when it is material in the sense of [being a] crucial, critical, highly significant factor," such that the trial is rendered fundamentally unfair.[55]

---

[49] *Id.*, p. 250, (Trial Transcript, page number 197).
[50] Id., p. 256, (Trial Transcript, page number 203).
[51] Id. The Court notes that there were three other Batson challenges, two by the defense, and one by the prosecution based on gender. After proper review, the judge allowed the peremptory challenges.
[52] *Mercado v. Massey*, 536 F.2d 107, 108 (5th Cir. 1976).
[53] *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999), quoting *Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991); see also *Molo v. Johnson*, 207 F.3d 773, 776 (5th Cir. 2000); and *Hogue v. Johnson*, 131 F.3d 466, 506 (5th Cir. 1997).
[54] *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991).
[55] *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986).

Here the petitioner argues that his second taped statement, taken after his first taped statement, and with the recorder turned off for the interim twenty-minute period, was coerced and involuntary. The petitioner alleges that since he was mentally deficient, able to become confused, and suggestible, that his confession was neither voluntary nor admissible.

On appeal, the Louisiana Fifth Circuit Court of Appeal addressed this issue on the merits. "The Louisiana Supreme Court has recognized that a diminished intellectual capacity does not, alone, vitiate the ability to knowingly and intelligently waive constitutional rights and make a free and voluntary confession. The critical factor is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement."[56] The court found the prosecution presented evidence that the petitioner had been advised of his rights and validly waived them by signing the form after stating that he had finished high school and could read and write. The appellate court further noted that no expert testimony at trial established petitioner was unable to understand his rights, his statements seemed lucid, and he had a familiarity with his rights from a previous experience.[57] The appellate court held that, "although the record supports that the Defendant had a diminished mental capacity, we do not find that the Defendant proved that this mental defect robbed him of his ability to understand his rights and the consequences of the waiver of those rights."[58]

Petitioner's post-conviction application was denied as repetitive and res judicata.[59]

The record does not support petitioner's claim that the statement was involuntary. He signed a form acknowledging and waiving his rights.[60] Each transcript documents that the petitioner agreed that he understood and waived his rights, he was not coerced or promised

---

[56] *State v. Pugh*, 831 So.2d 341, 353 (La.App. 5 Cir. 2002).
[57] *Id.* at 353-54.
[58] *Id.* at 354.
[59] State Rec. Vol. 1, Order, No. 97-7172, *State v. Pugh*, September 25, 2003.
[60] State Rec. Vol. 8, Rights of Arrestee or Suspects, September 18, 1997.

13

anything, and that his statement was voluntary.[61] A thorough reading of each transcript supports that petitioner was coherent, answered the detective's questions clearly, and gave a voluntary statement of the events in his own words, admitting in the second statement that he shot the victim, albeit accidentally, when the victim grabbed the gun as petitioner attempted to rob him.

The Court defers to the state court decision, finding nothing based on any unreasonable determination of the facts in light of the evidence presented at trial, and finding nothing contrary to or involving an unreasonable application of clearly established Federal law.

**(3) Petitioner argues that he was incompetent to stand trial and assist in his defense.**

Petitioner raised this argument on appeal and in his application for post-conviction relief.

It is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions."[62] A federal habeas court does not sit as a "super" state supreme court to review errors under state law.[63] An error made by the trial judge justifies "habeas corpus relief only when it is material in the sense of [being a] crucial, critical, highly significant factor," such that the trial is rendered fundamentally unfair.[64]

Here petitioner argues he was not competent to stand trial or participate in his defense.

On appeal, the Louisiana Fifth Circuit Court of Appeal addressed this issue on the merits. "The trial court is required to order a mental examination of the defendant only when it has a reasonable ground to doubt the defendant's mental capacity to proceed… The two-fold test of capacity to stand trial is whether a defendant understands the consequences of the proceedings

---

[61] State Rec. Vol. 8, Transcribed Audio Statement, September 18, 1997, 7:22 p.m., p. 1-14; and Transcribed Audio Statement, September 18, 1997, 7:58 p.m., p. 1-12.
[62] *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999), quoting *Estelle v. McGuire*, 502 U.S. 62, 67-8 (1991); see also *Molo v. Johnson*, 207 F.3d 773, 776 (5th Cir. 2000); and *Hogue v. Johnson*, 131 F.3d 466, 506 (5th Cir. 1997).
[63] *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991).
[64] *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986).

14

and has the ability to assist in his defense by consultation with counsel… Further, the trial court's ruling on a defendant's mental capacity to proceed is entitled to great weight on appellate review and will not be reversed absent an abuse of discretion."[65] The court found the trial judge had not abused his discretion in denying the defense's motion for a fourth competency hearing.[66]

> The last physicians who examined the Defendant could render no opinion on the Defendant's competence because of the Defendant's refusal to cooperate. The initial determination that the Defendant was incompetent was based on the Defendant's lack of understanding of his legal rights, not on any particular mental disease. The Defendant's capacity to understand changed after he was educated. The record reflects that the Defendant was literate and had no physical handicap. Although the Defendant did not ultimately testify at trial, the record reflects that the Defendant conversed intelligently with the trial court when he informed the trial court that he wished to testify and waive his right against self-incrimination. The Defendant's low I.Q. does not, alone, mandate a finding of incompetence. Further, it is noted that the Defendant was not a stranger to the trial process. About two years before the Defendant was tried and convicted by a jury of twelve persons for distributing cocaine. Defense counsel expressed concerns about the Defendant's competence, but no medical evidence was presented to support the claims.[67]

Petitioner's post-conviction application was denied as repetitive and res judicata.[68]

The record does not support that petitioner was not competent to stand trial. The petitioner was indicted by the grand jury in 1997 and defense counsel filed a motion to appoint a sanity commission.[69] The trial judge granted the motion on February 4, 1998.[70] On April 9, 1998, the petitioner was found not competent to stand trial; the trial judge ordered jail-based education and reset the competency hearing for July 9, 1998.[71] On July 9, 1998 the petitioner was found competent and was arraigned.[72] In early 1999, a second sanity commission was requested and petitioner was again found competent. The petitioner was found to be "functioning

---

[65] *State v. Pugh*, 831 So.2d 341, 349-51 (La.App. 5 Cir. 2002).
[66] *Id*. at 351.
[67] *Id*. at 350-351.
[68] State Rec. Vol. 1, Order, No. 97-7172, *State v. Pugh*, September 25, 2003.
[69] State Rec. Vol. 1, *State v. Pugh*, No. 97-7172, p. 75-6.
[70] State Rec. Vol. 1, *State v. Pugh*, No. 97-7172, p. 75-6.
[71] State Rec. Vol. 1, *State v. Pugh*, No. 97-7172, p. 91; see also Minute Entry #8 following.
[72] State Rec. Vol. 1, *State v. Pugh*, No. 97-7172, Minute Entry #9b.

intellectually in the Borderline to Mild Range of Mental Retardation and adaptively in the Borderline to Low Average range... Based on the results of this evaluation, the above-described difficulties would not preclude Mr. Pugh from being able to follow the course of a trial, work with his attorney in his own defense, and understand the court proceedings"[73]  In late 2000, a third sanity commission was requested and petitioner was again found competent, after a continuance required because the petitioner refused to cooperate with the evaluators.[74]  The Louisiana Supreme Court denied supervisory writs on the judge's ruling.[75]  Finally, on March 26, 2001, the trial judge granted a defense motion for an ex parte hearing on petitioner's competency, in order to prevent a breach of the attorney/client privilege.[76]  The judge again determined the petitioner was competent and the trial proceeded.  At trial, when petitioner insisted to counsel that he wanted to testify, the judge questioned the petitioner outside the presence of the jury about his understanding of his right to remain silent; the presumption of his innocence; the fact that his attorney's advice was not to testify; and the possible damage that could be done by his taking the stand, where he would be subject to cross-examination and the admission of his other convictions.[77]  The petitioner answered that he understood but wanted the jury to hear what really happened, that everyone was hiding the truth, and he wanted the jury to know he did not kill the victim.[78]  The judge determined that petitioner was competent and ordered the trial to continue after granting defense counsel a short time to confer with his client.  In fact, the defendant did not testify at trial.

---

[73] State Rec. Vol. 4, *State v. Pugh*, No. 97-7172, Neuropsychological Evaluation, March 30, 1999.
[74] State Rec. Vol. 4, *State v. Pugh*, No. 97-7172, Minute Entry #31, Oct. 25, 2000; Minute Entry #33, Dec. 7, 2000.
[75] State Rec. Vol. 4, No. 2000-KK-1994, *State v. Pugh*, No. 97-7172, January 12, 2001.
[76] State Rec. Vol. 4, *State v. Pugh*, No. 97-7172, Motion for Ex Parte Hearing, March 26, 2001.
[77] State Rec. Vol. 17, *State v. Pugh*, No. 97-7172, Trial Transcript, p. 1774-83.
[78] State Rec. Vol. 17, *State v. Pugh*, No. 97-7172, Trial Transcript, p. 1782.

The Court defers to the state court decision, finding nothing based on any unreasonable determination of the facts in light of the evidence presented at trial, and finding nothing contrary to or involving an unreasonable application of clearly established Federal law.

## VIII.  Conclusion

After a thorough review of the complaint, the record, and the applicable law, this Court finds that petitioner has failed to demonstrate that his state conviction and sentence present grounds for the relief requested.  Accordingly, **IT IS ORDERED** that the petition of JERRICK PUGH for writ of habeas corpus under 28 U.S.C. § 2254 is **DISMISSED WITH PREJUDICE**. Judgment will be entered accordingly.

New Orleans, Louisiana this 6th day of March, 2007.

_____
HELEN G. BERRIGAN
U.S DISTRICT JUDGE